

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



FILED

DEC _ 2003

LUTHER
By: _____ Deputy Clerk

EMORY UNIVERSITY; NATIONAL
UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA, as subrogee
of Emory University,

   Plaintiffs,

v.

ST. PAUL FIRE AND CASUALTY
COMPANY; ST. PAUL MERCURY
INSURANCE COMPANY,

   Defendants.

CIVIL ACTION
NO. 1:02-cv-1181-GET

O R D E R

The above-styled matter is presently before the court on:

(1) defendant St. Paul Fire and Casualty Company's motion for summary judgment [docket no. 34];

(2) defendant St. Paul Mercury Insurance Company's motion for summary judgment [docket no. 33];

(3) plaintiffs' motion for partial summary judgment on defendants' duty to defend the underlying Qui Tam action [docket no. 45];

(4) plaintiffs' motion for partial summary judgment on defendants' duty to defend the underlying RICO/Whistleblower action [docket no. 44];

(5) plaintiffs' motion for partial summary judgment on defendants' duty to defend the underlying equal opportunity actions [docket no. 43];

(6) plaintiffs' motion for partial summary judgment on defendants' duty to defend the underlying contractual interference action [docket no. 42];

(7) plaintiffs' motion for partial summary judgment on defendants' duty to defend the underlying breach of contract action [docket no. 41].

On May 2, 2002, plaintiffs filed this breach of contract and contribution action based upon the refusal of defendants to either defend or indemnify Emory in nine separate actions and proceedings filed by a doctor against Emory and certain employees and individuals.  On July 12, 2002, defendants answered the complaint and amended its answer on September 5, 2002.

The parties conducted a bifurcated, eight month discovery period.  The first five and a half months of discovery encompassed defendants' duty to defend and right to sue issues and concluded on January 24, 2003.

On February 21, 2003, plaintiffs filed motions for partial summary judgment on defendants' duty to defend the underlying breach of contract complaint, interference with contracts complaint, Qui Tam complaint, RICO/Whistleblower complaint, and five administrative actions.  On February 24, 2003, defendants

filed their motions for summary judgment.  On August 27, 2003, the court heard oral argument on these motions.

## Motion for Summary Judgment Standard

Courts should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party must "always bear the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  That burden is "discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325; see also U.S. v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991).

Once the movant has met this burden, the opposing party must then present evidence establishing that there is a genuine issue of material fact.  Celotex, 477 U.S. at 325.  The nonmoving party must go beyond the pleadings and submit evidence such as affidavits, depositions and admissions that are sufficient to demonstrate that if allowed to proceed to trial, a jury might return a verdict in

Page 3

his favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986). If he does so, there is a genuine issue of fact that requires a trial. In making a determination of whether there is a material issue of fact, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. <u>Id.</u> at 255; <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1529 (11th Cir. 1987). However, an issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." <u>Anderson</u>, 477 U.S. at 249-50. Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. <u>Id.</u> at 248. Thus, to create a genuine issue of material fact for trial, the party opposing the summary judgment must come forward with specific evidence of every element essential to his case with respect to which (1) he has the burden of proof, and (2) the summary judgment movant has made a plausible showing of the absence of evidence of the necessary element. <u>Celotex</u>, 477 U.S. at 323.


<u>Facts</u>

In light of the foregoing standard, the court finds the following facts for the purpose of resolving these motions for summary judgment only. Unless otherwise indicated, quoted statements refer to terms of the policies at issue.

Page 4

## I. St. Paul Insurance Policies

Defendants St. Paul Fire & Casualty Company ("St. Paul Fire") and St. Paul Mercury Insurance Company ("St. Paul Mercury") (collectively "defendants" or "St. Paul") issued three insurance policies to plaintiff Emory University ("Emory") that are at issue in this action.

## A. Commercial General Liability Policy

St. Paul Mercury issued Emory three Commercial General Liability ("CGL") policies for the periods January 1, 1996 through January 1, 1997; January 1, 1997 through January 1, 1998; and January 1, 1998 through February 1, 1999, respectively. The terms of the three policies are similar, with the only material distinction between the policies being the effective dates of coverage.

The policies obligate St. Paul Mercury:

> "to defend any claim or suit for covered injury or damage made or brought against any protected person. [St. Paul Mercury] will do so even if any of the allegations of any such claim or suit are groundless, false, or fraudulent."

Emory University is the named insured. By endorsement, employees of Emory are covered only for "work done within the scope of their employment by [Emory]; or their performance of duties related to the conduct of [Emory's] business." The policies provide two types of coverage: bodily injury/property damage liability protection and personal injury liability protection.

The personal injury liability coverage protects against "claims" or "suits" alleging a "personal injury" that is caused by a "personal injury offense" committed during the policy period. "Personal injury" is defined as "injury, other than bodily injury or advertising injury, caused by a personal injury offense." Covered "personal injury offenses" are specifically set forth in the policy. Excluded from coverage under the policy are personal injury claims against an employee by a co-worker.

The bodily injury/property damage liability coverage protects against "claims" or "suits" resulting from "bodily injury" or "property damage" that occurred during the policy period. "Property damage" is defined as "physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged." "Bodily injury" is "any harm to the health of other persons, including physical harm, sickness, disease, and mental anguish, injury or illness."

To be covered, any alleged bodily injury or property damage must be caused by an "event," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Excluded from coverage is "bodily injury or property damage that's expected or intended by the protected person."

Page 6

B. Professional Liability Coverage Protection Policy

Defendant St. Paul Fire issued Emory a Professional Liability Protection Policy for the period January 1, 1998 to February 1, 1999 ("PLP policy"). The PLP policy "provides protection against professional liability claims which might be brought against [the insured] in [its] professional practice." To be covered, a claim must be based on events that arise out of the profession - "faculty, students and staff."

Insured under the policy is Emory and its "present and former employees, faculty, preceptors, sponsors of research protocol, students, and volunteers, including but not limited to teaching, research and service, while acting within the scope of their duties as such." The policy protects Emory, as an organization, "against claims that result from professional services that were or should have been provided by anyone for whose acts [it is] legally responsible." Insured individuals are protected against claims that result from:

> "(1) professional services that [they] provided or should have provided. (2) Professional services that were or should have been provided by anyone for whose acts [they are] legally responsible. (3) [Their] service on a formal review board or any similar board or committee."

As a "claims-made policy," coverage applies only if Emory first reported a claim to St. Paul Fire during the effective dates of the policy - January 1, 1998 through February 1, 1999. The policy requires notice of a claim to include the "date, time and

Page 7

place of incident; what happened and what professional service [the insured] performed; type of claim  anticipated; name and address of the injured party; and name and address of any witness."   The policy limits claims to those stemming from an act or omission that occurred on or after September 1, 1985 and before January 1, 1992.

## C. The Umbrella Policy

Defendant St. Paul Fire issued Emory a Health Care Facility Umbrella  Excess  Liability  Protection/  Health  Care  Facility Professional and General Liability Protection policy for the period from January 1, 1996 through February 1, 1999 (the "Umbrella Policy").   The covered insureds under the policy include: "Emory University Hospital, Crawford Long Hospital, Jesse Parker Williams Hospital, Emory University, the Emory Clinic, Inc., and the Emory Egleston  Pediatric  Care  Foundation."   By  endorsement,  the organizations'  "present  and  former  employees,  students  and authorized volunteers are protected persons while working, or when they did work, . . . within the scope of their duties."

The Umbrella policy provided three types of coverage:

### 1. Professional Injury Coverage

The  professional  injury  coverage  of  the  Umbrella  policy protects  against  "claims  or  suits  resulting  from  professional injury  caused  by  professional  health  care  services  that  were

provided or should have been provided." A claim is not covered under the Umbrella policy unless it is also covered under the PLP policy.

This portion of the Umbrella Policy is a "claims-made policy." Therefore, for any professional liability claims to be covered, they must have been made before the policy expired on February 1, 1999 and after the coverage became effective on January 1, 1998.

### 2. Personal Injury Liability Coverage

The Umbrella Policy also protects against claims in which a plaintiff alleges damages against the insured for a "personal injury." Personal injury means

> "injury, other than professional injury or bodily injury, caused by any of the following offenses that result from [Emory's] business activities: false arrest, detention or imprisonment; malicious prosecution; wrongful entry or wrongful eviction; libel or slander; written or spoken material made public which belittles the products or work of others; written or spoken material made public which violates an individual's right of privacy; any other act that interferes with rights provided by an applicable Patients' Bill of Rights law or similar law."

To be covered, a claim must allege damages stemming from a "personal injury" that occurred during the policy period.

Excluded from coverage are "claims or suits that result from discrimination by any protected person." Discrimination is defined as "an act or omission based on prejudice which violates any civil rights law." In addition, the policy "won't cover claims or suits

Page 9

AO 72A
(Rev.8/82)

that result from the dishonest, fraudulent, or malicious act or omission of any protected person or anyone for whose acts a protected person is legally responsible." Finally, claims against employees for "personal injury to . . . any fellow employee" are also excluded.

### 3. Bodily Injury/ Property Damage Liability Coverage

The Umbrella Policy also provides coverage for "claims or suits resulting from bodily injury or property damage that's caused by an event and happens" during the policy period. An "event" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

"Property damage" is "physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged."  "Bodily injury" is "any physical harm, including sickness or disease to the health of other persons. It includes mental anguish, injury, or illness."

The bodily injury portion of the policy excludes from coverage any claims or suits that result from "discrimination" as defined by the policy, or from "dishonest, fraudulent, or malicious" acts or omissions.  In addition, the policy does not cover "bodily injury or property damage that's expected or intended by the protected person."

Page 10

## II. The Underlying Complaints and Lawsuits

Between 1998 and 2000, Dr. James Murtagh, an employee of Emory, filed nine separate claims and lawsuits against Emory and several individual defendants:

## A. Emory's Equal Opportunity Programs Complaint/Grievence

On May 14, 1998, Dr. Murtagh filed a complaint with Emory's internal Equal Opportunity Programs Office.  In his complaint, Murtagh alleged "discriminatory harassment." Dr. Murtagh requested several remedies, including:

> (1) to put an end to all efforts to sever my employment and tenured relationship with Emory School of Medicine (ESM) and my employment with Grady Memorial Hospital; (2) to stop the discriminatory, defamatory, and harassing actions of other faculty members towards me; (3) to ensure that my opportunities for career advancement and academic development are not affected by these events; (4) to ensure that my current record of excellence is reflected in all formal and/or informal evaluations of my performance; (5) to recognize and protect the rights of faculty members with psychiatric disabilities as required by the Americans with Disabilities Act and Emory School of Medicine's own policies and procedures; (6) to work to educate ESM faculty regarding the provisions of the ADA and ESM's own policies and procedures; (7) to arrange for ESM to reimburse me for medical and legal expenses incurred as a result of these conflicts; and (8) to implement policies to prevent recurrence of behaviors and retaliatory actions."

## B. First Equal Employment Opportunity Commission Complaint

On June 11, 1998, Murtagh filed a "Charge of Discrimination" (No. 110982979) against Emory with the Equal Employment Opportunity

Page 11

Commission ("first EEOC Complaint").  Murtagh alleged that he was "discriminated against and retaliated against because of [his] National Origin, Irish American . . . and because of [his] disability."  Murtagh cited as examples the fact that when he returned to work from disability leave, his supervisor demanded that he type a letter of resignation.  In addition, "a Fellows meeting was formed with the purpose of tampering with [his] evaluations."

## C. First United States Department of Education Office for Civil Rights Complaint

On August 4, 1999, Murtagh filed a "Discrimination Complaint" (no. 04992224) with the United States Department of Education Office for Civil Rights ("OCR")  ("first OCR complaint").  A September 3, 1999 letter from OCR to Emory stated that Murtagh accused Emory of "discriminat[ing] against students and employees on the basis of race, color, national origin, sex, and disability."

## D. Breach of Contract Suit

On August 30, 1999, Murtagh filed a breach of contract lawsuit (no. 99-9971-4) against Emory, Manuel Martinez-Maldonado, M.D.; Juha P. Kokko, M.D., Ph.D.; and Gerald W. Staton, Jr., M.D. in the Superior Court of Dekalb County, Georgia.  Murtagh alleged three causes of action in the complaint: breach of contract, detrimental

AO 72A
(Rev.8/82)

reliance, and intentional infliction of emotional distress.   On October 12, 1999, Murtagh amended his complaint to add a cause of action for defamation against Samuel M. Aguayo, M.D.

## E. Qui Tam Lawsuit

On November 9, 1999, Murtagh and Diane Owen filed a Qui Tam Complaint (no. 1:99-cv-2909) on their own behalf and on behalf of the United States of America against Emory, in the United States District Court for the Northern District of Georgia.   The plaintiffs amended the complaint on November 13, 2000 and April 30, 2001.   The complaint alleged three causes of action under the False Claims Act, 31 U.S.C. § 3729(a)(1), (2), and (7).

## F. RICO/Whistleblower Lawsuit

On December 7, 1999, Murtagh filed a complaint pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et. seq., and the Whistleblower Act, 31 U.S.C. § 3310(h), in the United States District Court for the Northern District of Georgia (no. 1:99-cv-3157) ("RICO/Whistleblower complaint").   Defendants in the action were Fulton-Dekalb Hospital Authority, Emory, William J. Casarela, David Guidot, Gerald Staton, and other unknown individuals.   Murtagh stated his causes of actions as a "Whistle Blower Protection Claim" and a "Civil RICO"

claim. In the complaint, Murtagh makes factual allegations that the defendants caused him property damage as well.

## G. Second OCR Complaint

On February 4, 2000, Murtagh filed a "Discrimination Complaint" (no. 04-00-2057) with the United States Department of Education's Office for Civil Rights ("OCR"). The complaint alleged that Emory retaliated against Murtagh after he filed his Title VII complaint with the EEOC. Murtagh stated in the complaint that "since filing his original [OCR] complaint, [he] has been retaliated against at every opportunity." Murtagh contended that this retaliation began after September 3, 1999.

## H. Second EEOC Complaint

On April 25, 2000, Murtagh filed a "Charge of Discrimination" (No. 110A02422) against Emory with the EEOC ("second EEOC Complaint"). In the complaint, Murtagh alleged that since filing his first EEOC complaint, "he has been subjected to a hostile work environment and has been treated less favorable [sic] than similarly situated employees because of his exercise of statutorily protected activity through filing and pursuing a charge of discrimination." In addition, Murtagh stated that Emory "engaged in a continuing violation of the American with Disabilities Act

AO 72A
(Rev.8/82)

through unequal treatment of [Murtagh] and the maintenance of a hostile work environment because of his perceived disability."

## I. Contractual Interference Lawsuit

On December 20, 2000, Murtagh filed a lawsuit (no. 2000-cv-32025) against William J. Casarella, David Guidot, Gerald Staton, and other presently unknown individuals, in the Superior Court of Fulton County, Georgia ("contractual interference lawsuit"). Murtagh states in his complaint that the named defendants "at all times material hereto are agents and employees of The Emory University Health Care System." The complaint sets forth two causes of action: interference with contractual relationships and intentional infliction of emotional distress.

## III. Notice to St. Paul

On January 29, 1999, Emory sent a letter to St. Paul regarding "James Murtagh" in which Emory requested that St. Paul "establish a claim file under the University's general liability policy (or any other policies that may apply)." Attached to the letter was a copy of a January 11, 1999 letter from Murtagh's attorney demanding $500,000.00 and alleging several causes of action that he might "successfully pursue against Emory."

These possible claims included "breach of contract," "defamation and intentional infliction of emotional distress,"

"national origin discrimination," and "disability discrimination."
Murtagh's attorney noted that these claims were "not meant to be an
exhaustive list."

## IV. National Union Fire Insurance Company

National Union Fire Insurance Company ("National Union")
issued a Directors, Officers, and Trustees Insurance policy (no.
861-57-16) to Emory for the period of January 20, 1998 to January
29, 2001. By no later than August 7, 1998, Emory provided National
Union materials indicating that Dr. Murtagh had retained counsel
with regard to his employment claims against Emory. Subsequently,
Emory settled Dr. Murtagh's claims, and National Union reimbursed
Emory for its defense costs. Pursuant to the policy's terms,
National Union joins Emory in this action as a subrogee.

## Discussion

Plaintiffs have filed separate motions for summary judgment on
the issue of defendants' duty to defend each of the underlying
complaints. Defendant St. Paul Mercury has filed one motion for
summary judgment on the issue of its duty to defend all the
underlying lawsuits under the CGL policies. Defendant St. Paul Fire
has filed one motion for summary judgment on the issue of its duty
to defend all the underlying lawsuits under the professional
liability and umbrella policies.

Page 16

AO 72A
(Rev.8/82)

Under Georgia law, "[a]n insurer's duty to pay and its duty to defend are separate and independent obligations." <u>Utica Mut. Ins. Co. v. Kelly & Cohen, Inc.</u>, 233 Ga. App. 555, 556 (1998). "An insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." <u>Penn-Amer. Ins. Co. v. Disable Amer. Veterans, Inc.</u>, 268 Ga. 564, 565 (1997). "To determine whether a duty to defend exists, [the court] must compare the allegations of the complaint as well as the facts supporting those allegations, against the provisions of the insurance contract." <u>Pacific Employers Ins. Co. v. Cesnik</u>, 219 F.3d 1328, 1330 (11th Cir. 2000); <u>see</u> <u>Great Amer. Ins. Co. v. McKemie</u>, 244 Ga. 84, 85-86 (1979).

## I. Underlying Breach of Contract Complaint

Both plaintiffs and defendants have filed motions for summary judgment on defendants' duty to defend Dr. Murtagh's breach of contract law suit.

### A. CGL policy - Personal Injury Coverage

The personal injury liability coverage protects against complaints that allege damages stemming from a "personal injury offense" specifically set forth in the policies. These offenses include:

> "false arrest, detention or imprisonment; malicious prosecution; wrongful entry or wrongful eviction;

invasion of the right of private occupancy of a room, dwelling or premises that a person occupies; libel or slander; making known to any person or organization written or spoken material that belittles the products, work or completed work of others [("belittlement")]; making known to any person or organization written or spoken material that violates an individual's right of privacy."

The underlying lawsuit consisted of both an original and an amended complaint. The court will consider each in turn.

### 1. Murtagh's original complaint

Murtagh's original complaint contains three counts: breach of contract, detrimental reliance, and intentional infliction of emotional distress. None of these counts state a cause of action alleging a "personal injury offense" as listed in the policy. Therefore, St. Paul Mercury properly denied Emory's request to defend the suit based on the enumerated claims.

Plaintiffs, however, point to several factual allegations in the original complaint to argue that Murtagh also alleged claims of "libel," "slander," and "belittlement":

- "Based upon our information and belief, Drs. Roman and Aguayo, who are Hispanic, presented to Dr. Murtagh's supervisor, Dr. Martinez-Maldonado, who is also Hispanic, with a document that contains untrue negative allegations concerning Dr. Murtagh's professional competency."
- "On information and belief, Defendants and others have made defamatory statements to potential employers and others and have taken actions that constitute intentional interference with contract which discovery will establish."

Page 18

Coverage is determined based on the claims under which relief is sought in the complaint. See Cantrell v. Allstate Ins. Co, 202 Ga. App. 859, 860 (1992). "The mere fact that the factual allegations of a complaint contain the words ['defamatory'], 'libel' or 'disparaging' cannot form the basis for coverage" under the policy's personal injury provision. Amer. and Foreign Ins. Co. v. Church Schs. in the Diocese of Va., 645 F. Supp. 628, 634 (E.D. Va. 1986). See also C.O. Morgan Lincoln-Mercury, Inc. v. Vigilant Ins. Co., 521 S.W. 2d 318 (Tex. Civ. App. 1975) (factual allegation of libel in suit for conversion does not warrant coverage under a CGL policy ). Murtagh clearly and unequivocally manifests in both his pleadings and his response to Emory's underlying motion for summary judgment, that he is asserting claims solely for breach of contract and intentional infliction of emotional distress. As such, Murtagh's original complaint did not contain any causes of action to warrant coverage under the personal injury provisions of the CGL policy.

### 2. Murtagh's amended complaint

On October 12, 1999, Murtagh amended his lawsuit to add an express count of defamation against Dr. Samuel M. Aguayo. A claim of defamation is listed as a "personal injury offense" in the policy. Nevertheless, defendant St Paul Mercury argues that it was

Page 19

not required to defend this claim because Dr. Aguayo was not an insured individual.

The CGL policies insure Emory employees for "work done within the scope of their employment by [Emory]." Murtagh's amended complaint alleged that Dr. Aguayo "was at all times relevant to [the] case, a doctor at the Atlanta VAMC [Veterans' Administration Medical Center]." In addition, a United States Attorney represented Dr. Aguayo in the underlying action, thereby indicating that Dr. Aguayo was employed by the Veteran's Administration, not Emory. Thus, Aguayo was not an insured under the policy.

Even if Dr. Aguayo were an Emory employee at the time he made the allegedly slanderous statements, the policies' co-worker exclusion clause would have precluded coverage. This clause states that "no employee is a protected person for ... personal injury to ... any fellow employee." Therefore, regardless of Aguayo's employment status, as a matter of law, St. Paul Mercury had no duty to defend Dr. Murtagh's defamation claim against Dr. Aguayo.

## B. CGL Policy - Bodily Injury Liability

The bodily injury liability provisions of the policy cover lawsuits that seek damages for a bodily injury that is caused by an "event." An "event" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Page 20

Here, Murtagh's claim of intentional infliction of emotional distress is not covered because the policy explicitly excludes from coverage "bodily injury or property damage that's expected or intended by the protected person." Intentional infliction of emotional distress is, by its very nature, an intentional tort. <u>See</u> <u>Hain v. Allstate Ins. Co.</u>, 221 Ga. App. 486, 486 (1996). Therefore, St. Paul Mercury had no duty to defend this claim. <u>See</u> <u>Cesnik</u>, 219 F.3d at 1331. (holding that an injury based on allegations of intentional conduct does not result from an accidental "occurrence").

Next, Murtagh alleges that he "entered into a binding contract with Emory" that it failed to fulfill. Liability, if any, based upon the alleged facts, would constitute a breach of contract; they are not damages that the insured could be liable for by reason or on account of a bodily injury and, therefore, do not fall within the scope of the policy. <u>See</u> <u>Cesnik</u>, 219 F.3d at 1332.

Finally, as to the defamation claim against Dr. Aguayo, St. Paul Mercury had no duty to defend this cause of action because Aguayo was not an insured at the time of the alleged incidents. In addition, Murtagh's complaint states that Aguayo "intentionally" made untrue statements about Dr. Murtagh. Thus, the "intentional acts" exclusion precludes coverage of the defamation claim as well.

Page 21

Plaintiffs argue that the "intentional acts" exclusion should not apply because "Georgia courts narrowly interpret the concept of wilful conduct in the context of insurance policies . . . ." See S. Guar. Ins. Co. of Ga. v. Saxon, 190 Ga. App. 652, 654 (1989). However, the law also states that "if the natural, inevitable consequences of defendant's actions were injury to the victim . . ., he [is] presumed to have acted intentionally." Roe v. State Farm Ins., 188 Ga. App. 368 (1988). Here, Dr. Murtagh's complaint specifically alleges that Dr. Aguayo "with malice and *intent to harm* made untrue statements about [Murtagh's] profession." (emphasis added). This statement indicates that Murtagh's injuries were intended, and thus St. Paul Mercury properly excluded them from coverage. See Hain, 221 Ga. App. at 487 (ruling that plaintiff's bodily injury is not "accidental" where plaintiff alleges that the tortious act and resulting harm were "intentional"). Accordingly, St. Paul Mercury had no duty to defend any of the claims in the underlying breach of contract suit under the bodily injury portion of the CGL policy.

### C. Professional Liability Protection ("PLP") Policy

The PLP policy provides claims-made coverage for professional liability claims. "Coverage under a claims made policy is effective only if the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term. The essence

AO 72A
(Rev.8/82)

of such a policy is notice to the insurer within the policy period." Resolution Trust Corp. v. Artley, 24 F.3d 1363, 1367 (11th Cir. 1994) (internal citations omitted). The policy period for the PLP at issue was January 1, 1998 to February 1, 1999.

The policy specifies that notice of a claim should include: "the date, time, and place of incident; what happened and what professional service [Emory] performed; type of claim [Emory] anticipated; name and address of injured party; and name and address of any witness." In the instant situation, Emory sent a letter to St. Paul regarding "James Murtagh" on January 29, 1999. The letter requested that St. Paul "establish a claim file under the University's general liability policy (or any other policies that may apply)." Attached with the letter was a copy of a January 11, 1999 demand from an attorney representing Murtagh.

Although these documents identified several potential claims against Emory, the letters fail to identify a professional services liability cause of action, or what professional service Emory failed to provide that triggered a possible claim. In addition, Emory's notification letter to St. Paul Fire explicitly mentions coverage under the CGL policies; yet, Emory never refers to the PLP policy in its notice of claim. Thus, the January 29, 1999 letter and attachment from Emory did not constitute proper notice to St. Paul Fire within the meaning of the PLP policy. Accordingly, St. Paul Fire properly denied coverage. See Serrmi Products, Inc. v. Ins.

Co. of Pa., 201 Ga. App. 414, 415 (1991) (ruling that "if a court were to excuse the insured from reporting requirement . . ., such is tantamount to an extension of coverage to be insured gratis, something for which the insured has not bargained").

Even if Emory's notice of claim were timely and proper, none of the underlying acts alleged by Dr. Murtagh occurred within the policy's coverage period. The "Known Prior Acts Limitation Endorsement" of the policy limits claims to those predicated on an act or omission that occurred between September 1, 1985 and January 1, 1992. Emory cites, however, the original "When A Claim is Covered" portion of the policy as evidence that St. Paul Fire was obligated to "cover claims that result from the professional service [Emory] performed or should have performed *after* [September 1, 1985]." (emphasis added).

The policy endorsement specifically states that it replaces the original "When A Claim is Covered" section of the policy. As such, the conduct prompting the underlying lawsuit must have occurred between September 1, 1985 and January 1, 1992. Murtagh's complaint alleges that the wrongful acts causing his damages occurred after Murtagh's colleagues learned that he had received tenure on May 24, 1995. These allegations fall outside the relevant time period of the policy, and thus, St. Paul Mercury properly denied coverage.

Finally, plaintiffs contend that the underlying complaint alleges a covered professional liability cause of action because the

Page 24

individual defendants participated in peer review activities regarding Murtagh. Even if this argument is correct, none of the alleged wrongful activity occurred during the policy period, and Emory's notice of claim was defective. As such, there exists no dispute of fact whether St. Paul Fire properly denied coverage of the breach of contract suit under the PLP policy.

## II. Underlying Intentional Interference with Contract Lawsuit

Both plaintiffs and defendants have filed motions for summary judgment on defendants' duty to defend Dr. Murtagh's contractual interference lawsuit.

### A. CGL policy - Personal Injury Coverage

The CGL policies only cover claims arising from damage or wrongful conduct from January 1, 1996 through February 1, 1999. In the underlying complaint, Dr. Murtagh attributes his injuries to his cooperation with the National Institute of Health (NIH)'s investigation of Emory that began "since at least June 1999." Therefore, any wrongful conduct could not have occurred within the policy's coverage period, and St. Paul Mercury had no obligation to defend against this suit.

In addition, the defendants in the underlying suit were "William J. Casarella, David Guidot, Gerald Staton, and other presently unknown individuals." The policies exclude coverage of

Page 25

any employee for "personal injury to . . . any fellow employee." Because the named defendants worked with Murtagh when the alleged wrongful acts occurred, the co-worker exclusion clause precludes coverage of Murtagh's suit as well.

Finally, Murtagh's complaint sets forth two counts: interference with contractual relationships and intentional infliction of emotional distress. Neither of these causes of actions are listed as "personal injury offenses" in the policy. Therefore, St. Paul Mercury was not obligated to defend against these claims.

Plaintiffs, however, point to the following factual allegation of defamation in the underlying complaint to argue that coverage was warranted: "Defendants . . . exaggerated and fostered false accusations regarding Dr. Murtagh's conduct in an attempt to have his position terminated." This allegation is merely a recital of the underlying facts that support Murtagh's alleged interference of contracts and intentional infliction of emotional distress charges. See C.O. Morgan, 521 S.W. 2d at 321-22; Church Schs., 645 F. Supp. at 634. The face of the underlying complaint makes clear that Murtagh was not seeking damages for "slander," "libel," or "belittlement." Rather, Murtagh only sought relief for contractual and emotional distress injuries. Therefore, St. Paul Mercury had no duty to defend the underlying lawsuit.

Page 26

B. CGL Policy - Bodily Injury Liability

The policy period ended on February 1, 1999.  The underlying complaint, however, is based upon the conduct of Dr. Murtagh's co-workers after they learned that Dr. Murtagh had cooperated with NIH's investigation of Emory since at least June, 1999.  Therefore, the alleged wrongful conduct could not have occurred during the policy's coverage period, and St. Paul Mercury had no obligation to cover this suit.

Murtagh alleges that his injuries resulted from the underlying defendants':

- holding "several surreptitious meetings . . . regarding having Dr. James Murtagh suspended";
- conferring on several occasions "to plan, discuss, and implement the removal of Dr. Murtagh";
- threatening "to resign certain of their own positions, if Dr. Murtagh was not removed";
- attempting "to persuade others to join their conspiracy to have Dr. Murtagh removed from his position."
- "maliciously interfer[ing] with Dr. Murtagh's right to contract for employment."

Murtagh also alleges that the underlying defendants "acted purposefully and maliciously with the *intent to injure* [him]."  All of these factual allegations describe intentional conduct.  See, e.g., Cesnik, 219 F.3d at 1331; Black's Law Dictionary (7th ed. 1999) (defining "malicious" as "substantially certain to cause injury").  As such, the court cannot conclude that any alleged bodily injury Murtagh suffered was unintentional or the result of an accident, as required by the policy.  See Hain, 221 Ga. App. at

Page 27

486-87 (resulting harm from tort of intentional infliction of emotional distress is not unintended); see also Roe, 188 Ga. App. at 368.  Accordingly, the evidence fails to create a question of fact that St. Paul Mercury had a duty to defend Murtagh's interference with contracts lawsuit under the bodily injury liability section of the CGL policy.

## C. Professional Liability Protection ("PLP") Policy

The PLP policy, expiring on February 1, 1999, provides claims-made coverage for professional liability claims.  Emory could not have provided notice to defendant St. Paul Fire within the policy period because Dr. Murtagh's claims were based upon wrongful acts that did not occur until at least June, 1999.  In addition, coverage was properly denied because the policy only covers acts that occurred between September 1, 1985 and January 1, 1992, as stated in the "Known Prior Acts Limitation Endorsement" of the policy.

Even if the underlying events occurred within the policy period, St. Paul Fire was warranted in denying coverage because Emory's notice of a potential claim was defective.  Emory's January 29, 1999 notice of claim to St. Paul Fire did not identify a contractual interference cause of action, or what professional services gave rise to coverage in this circumstance.  Moreover, Emory's notification letter to St. Paul Fire explicitly mentions

Page 28

coverage under the CGL policies; yet, Emory never refers to the PLP policy in its notice of claim.   See Serrmi, 201 Ga. App. at 415.

Finally, plaintiffs argue that the underlying complaint alleges a covered professional liability cause of action based on the individual defendants participation in peer review of Dr. Murtagh. Even if this argument is correct, none of the alleged wrongful activity occurred during the policy period, and Emory's notice of claim was defective.   Therefore, as a matter of law, St. Paul had no duty to defend the underlying interference with contracts lawsuit under the PLP policy.

III. Underlying Administrative Actions

Both plaintiffs and defendants have filed motions for summary judgment on defendants' duty to defend Dr. Murtagh's five administrative complaints.

A. CGL Policies - Personal Injury Coverage

The underlying administrative complaints are all grievances alleging discrimination and/or harassment.   The E.E.O.C. complaints are titled "Notice of Charge of Discrimination"; the OCR charge is labeled as a "Discrimination Complaint"; and, the internal Emory EOP grievence is categorized as a complaint for "Discriminatory Harassment".   Claims of "discrimination" and "harassment" are not

AO 72A
(Rev.8/82)

set forth as "personal injury offenses" in the policy. Thus, St. Paul Mercury had no duty to defend those complaints.

Nevertheless, plaintiffs point to the following allegations in the underlying administrative complaints to argue that coverage was warranted:

- Murtagh's colleagues made unsolicited calls to other doctors and hospitals "during which false and negative information was given to that institution regarding [his] performance."
- Murtagh's colleagues "all made disparaging statements about Dr. Murtagh," and the "allegations are demonstrably false."

These allegations are "simply a recital of facts" to support Murtagh's express discrimination and harassment charges. See C.O. Morgan, 521 S.W. 2d at 321-22. It is clear from the face of Murtagh's administrative actions that the gravamen of his complaints was a request for authorities to investigate his charges of discrimination. Accordingly, St. Paul Mercury had no duty to defend the administrative actions because Murtagh did not allege an applicable "personal injury offense" to warrant coverage. See, e.g., Omark Indus., Inc. v. Safeco Ins. Co. of Amer., 590 F. Supp. 114, 120 (D. Or. 1984). (factual allegations of defamation in context of a discrimination suit did not warrant coverage under the personal injury provision of an insured's general liability policy).

In addition, the policies only require a defense of "claims" and "suits," defined as a civil proceeding or demand "which seeks damages." The EEOC and OCR complaints do not demand damages, but

simply notify federal authorities of alleged discriminatory conduct. In fact, in the second O.C.R. complaint, Murtagh states that an equitable resolution to his charges would be "an injunctive order mandating an adequate processing mechanism for handling internal complaints." Thus, St. Paul Mercury properly denied coverage to the administrative complaints because they did not seek damages.   See generally Campbell Soup Co. v. Liberty Mut. Ins. Co., 571 A.2d 1013, 1019 (N.J. Super. Ct. Ch. Div. 1990), aff'd, 571 A.2d 969 (N.J. Super Ct. App. Div. 1990) (ruling that an EEOC complaint did not warrant a duty to defend because the EEOC has no power to enter an order which obligates employer "to take specific action and pay damages").

Accordingly, St. Paul Mercury had no duty to defend any of the administrative complaints under the personal injury liability protections of the policy.

### B. CGL Policy - Bodily Injury Liability

Pursuant to the "employer liability exclusion" of the policy, claims of "bodily injury to an employee arising out of and in the course of his or her employment" are not covered.  Murtagh filed the administrative complaints solely against his employer Emory, alleging that his injuries occurred as a result of his employment at Emory.   Therefore, St. Paul Mercury had no duty to defend the

administrative complaints because they arose out of and in the course of Murtagh's employment at Emory.

In addition, discrimination and harassment claims do not arise from an accidental "event" as is required to give rise to a duty to defend under the policy. See SCI Liquidating Corp. v. Hartford Fire Ins. Co., 181 F.3d 1210, 1217-1218 (11th Cir 1999). Moreover, the policy's "intentional acts" exclusion precludes coverage of harassment and discrimination allegations as well. See Presidential Hotel v. Canal Ins. Co., 188 Ga. App. 609, 611 (1988) (claims of harassment arise from "intentional conduct, [and] it cannot be said that any resulting bodily injury . . . was unintended). Finally, the O.C.R. and E.E.O.C. complaints do not make a demand for monetary damages as required by the policy. See Campbell Soup, 571 A.2d at 1019.

Therefore, as a matter of law, St. Paul Mercury had no duty to defend the underlying administrative actions under the bodily injury provisions of the personal injury policy.


C. Professional Liability Protection ("PLP") Policy

St. Paul Fire was authorized to deny coverage because Emory's January 29, 1999 notice of a potential claim was defective. See Serrmi, 201 Ga. App. at 415. Emory's "notice" letter never identified any of the administrative complaints as a basis for a claim, let alone what professional services gave rise to coverage,

even though two of the administrative actions had already been filed against Emory.

Next, the PLP policy provides coverage for amounts Emory is "legally required to pay as damages for covered professional liability claims." Because the O.C.R. and E.E.O.C. complaints did not seek damages, St. Paul Fire had no duty to defend these complaints. See Campbell Soup, 571 A.2d at 1019. In addition, none of the acts or damages alleged in the administrative complaints occurred between the coverage period of September 1, 1985 and January 1, 1992 as required by the "Known Prior Acts Limitation Endorsement" of the policy.

Finally, Emory contends that the underlying complaint alleges a covered professional services liability cause of action arising from individual doctors' peer review activities. Even if this argument is correct, none of the alleged wrongful activity occurred during the policy period, and Emory's notice of claim was defective. Therefore, St. Paul had no duty to defend the underlying interference with contracts lawsuit under the PLP policy.


IV. Underlying RICO/Whistleblower Complaint

Both plaintiffs and defendants have filed motions for summary judgment on defendants' duty to defend Dr. Murtagh's RICO/Whistleblower lawsuit.

Page 33

A. CGL Policy - Personal Injury Coverage

The CGL policies only cover claims arising from damage or wrongful conduct from January 1, 1996 through February 1, 1999. Murtagh's RICO/Whistleblower complaint is based on defendants' conduct after they learned that Dr. Murtagh had cooperated with NIH's investigation of Emory "since at least June 1999." Therefore, any wrongful conduct could not have occurred within the policy's coverage period, and thus, St. Paul Mercury had no obligation to defend against this suit.

Even if the alleged wrongful acts occurred within the policy's time period, the face of the complaint does not allege a covered claim.  The underlying suit alleges two counts: a whistleblower protection claim and a civil RICO Act claim.  Neither of these causes of action are set forth as "personal injury offenses" in the policy.

Plaintiffs, however, point to the following allegations in the underlying complaint to argue that coverage was warranted:

- "Defendants . . . met and/or conferred telephonically on multiple occasions in 1999, to discuss the progress of the false accusations against Dr. Murtagh, which information was then used by Defendants and by Burton Dodd to influence and alter the Qui Tam proceedings and to influence or dissuade Dr. Murtagh from cooperation in any investigation and/or impeded any further whistle-blowing against Defendant Emory."
- "The . . . accusations against Dr. Murtagh, his subsequent suspension, as well as the tampering and/or destruction to his tangible, personal property have caused an injury to his business or

Page 34

property . . . including his professional reputation, professional marketability . . . ."

These factual allegations do not state independent claims, but simply support Murtagh's RICO and whistleblower causes of action, which require him to prove witness tampering and retaliatory employment actions in order to state a valid claim. See U.S. v. Harriston, 329 F. 3d 779, 785 (11th Cir. 2003)(liability for racketeering conspiracy under RICO requires proof of agreement to commit "two predicate acts"); S. Rep. No. 99-345, at 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300 ("[The whistleblower protection provision] provides relief only if the whistleblower can show . . . that the employer's retaliatory actions resulted 'because' of the whistle blower's participation in a protected activity."). The underlying action is not a suit asserting libel, slander, or belittlement; the factual allegations describing alleged disparaging remarks and threats are "simply a recital of facts" to support the express whistle blower and the RICO claims. See C.O. Morgan, 521 S.W. 2d at 321-22; Church Schs., 645 F. Supp. at 634. Therefore, St. Paul Mercury had no duty to defend the underlying suit under the personal injury protections of the policy.

### B. CGL Policy - Bodily Injury/Property Damage Liability

The underlying complaint is based on defendants' conduct after the policy expired on February 1, 1999, and thus are not covered

Page 35

under the policy.   Even if the wrongful acts and damage occurred during the policy period, the RICO claims are based on allegations of intentional conduct; therefore, any injury would not result from an "event" or accident, as required for coverage.  See Cesnik, 219 F.3d at 1331.

The whistleblower claim involves the same conduct as the RICO allegation, namely that the underlying defendants instigated negative employment actions against Murtagh "to influence, corrupt, and tamper" with his cooperation in federal investigations.  Such conduct is excluded from coverage because the underlying defendants' acts were intentional and willful.  See generally JLM Enters., Inc. v. Houston Gen. Ins. Co., 196 F. Supp. 2d 1299, 1309-10 (S.D. Ga. 2002).   Murtagh also makes factual allegations that defendants' damaged his "tangible personal property" in retaliation for his cooperation with federal officials. Murtagh states that "the person(s) who caused the property damage did so knowingly." (emphasis added).  Thus, St. Paul Mercury had no duty to defend the RICO/whistleblower action under the bodily injury provisions of the CGL policy.

### C. Professional Liability Protection ("PLP") Policy

The PLP policy expired on February 1, 1999.  Emory could not have provided notice within the policy period because the alleged wrongful conduct occurred after Murtagh began cooperating with the

federal government's investigation of Emory in June, 1999. Likewise, St. Paul Fire properly denied coverage because the policy only covers acts that occurred between September 1, 1985 and January 1, 1992 pursuant to the "Known Prior Acts Limitation Endorsement."

Even if the underlying events occurred within the policy period, St. Paul Fire was authorized in denying coverage because Emory's notice of a potential claim was defective. See Serrmi, 201 Ga. App. at 415. Specifically, Emory's January 29, 1999 "notice" letter never identifies the possibility of a RICO or whistleblower claim, or what professional service gave rise to coverage, as required by the PLP policy.

Finally, Emory contends that the underlying complaint alleges a covered professional liability cause of action arising from the individual defendants' peer review activity of Murtagh. Even if this argument is correct, none of the alleged wrongful activity occurred during the policy period, and Emory's notice of claim was defective. Therefore, as a matter of law, St. Paul had no duty to defend the underlying RICO/Whistleblower lawsuit under the PLP policy.


## V. Underlying Qui Tam Complaint

Both plaintiffs and defendants have filed motions for summary judgment on defendants' duty to defend Dr. Murtagh's Qui Tam complaint.

Page 37

A. CGL Policy - Bodily Injury Coverage

A qui tam action is predicated upon the fact that an entity knowingly defrauded the government. See 31 U.S.C. § 3729(a)(2). Therefore, any injury Murtagh suffered could not have been caused by an accidental "event" to warrant coverage under the policy. Similarly, the policy's "intentional acts" exclusion would preclude coverage as well. See M/G Transport Servs., Inc. v. Water Quality Ins. Syndicate, 234 F.3d 974, 978 (6th Cir. 2000).

Plaintiffs argue that St. Paul Mercury had a duty to defend the suit because Murtagh's portion of a qui tam award would be proportional to the harm he suffered in bringing the action, including severe emotional strain.  The chief purpose of a qui tam statute is to provide for restitution to the government of money taken by fraud. See U.S. ex. rel. Marcus v. Hess, 317 U.S. 537, 551 (1943).  Plaintiffs have pointed to no allegations in the underlying complaint that Murtagh suffered bodily injury in bringing the complaint or by Emory's actions. Accordingly, the face of Murtagh's qui tam suit indicates that it was a qui tam action, not a claim for a bodily injury that would warrant coverage under the policy.  See generally, Info. Sys. & Network Corp. v. Fed. Ins. Co., 805 A.2d 1141, 1146-47 (Md. App. 2002); Hercules, Inc. v. AIG Aviation, Inc., 776 A.2d 550, 559 (Del. Super. Ct. 2000).

### B. Professional Liability Protection ("PLP") Policy

Plaintiffs argue that Emory's alleged misappropriation of "federal funds ear-marked for research clearly falls within coverage under the PLP policy." Even if this argument correctly identifies a professional liability cause of action, St. Paul Fire properly denied coverage because Emory's January 29, 1999 notice of claim was defective since it never mentions a qui tam claim, or what professional services Emory failed to perform to warrant coverage. Moreover, none of the alleged wrongful acts occurred between the coverage period of September 1, 1985 and January 1, 1992 as required by the "Known Prior Acts Limitation Endorsement" of the policy. Therefore, St. Paul Fire had no duty to defend the qui tam action under the PLP policy.


### VI. Coverage Under the Umbrella Excess Policy

Plaintiffs allege that St. Paul Fire had a duty to defend all of Dr. Murtagh's underlying suits under the Umbrella Policy it issued. The Umbrella policy excludes from coverage "claims or suits that result from discrimination by any protected person." Discrimination is defined as "an act or omission based on prejudice which violates any civil rights law." Because Murtagh's underlying administrative complaints all allege discrimination in violation of federal laws, St. Paul Fire properly denied coverage as to those five complaints.

AO 72A
(Rev.8/82)

The Umbrella policy provides three types of coverage relevant to this action:

## 1. Professional Injury Liability

For a claim to be covered under the professional injury liability portion of the Umbrella policy, Emory's basic PLP policy also must have covered the claim. As discussed above, none of Dr. Murtagh's underlying claims fell within the coverage provisions of Emory's basic PLP policy. Therefore, St. Paul Fire had no obligation to defend the underlying suits under the Umbrella policy's professional injury liability provisions as well.

## 2. Bodily Injury and Property Damage Liability

The Umbrella policy also protects against "claims or suits resulting from bodily injury or property damage that's caused by an event." Similar to the CGL policies, the Umbrella policy excludes from coverage claims arising from intended acts. In addition, for a claim to be covered, any wrongful act leading to an injury must have occurred before the policy expiration date of February 1, 1999.

Here, none of the alleged bodily injury and property damage alleged by Murtagh in the underlying lawsuits arose from accidental or unintended conduct. Moreover, Murtagh's contractual interference suit and RICO/Whistleblower suit are based on alleged wrongful conduct that would have occurred after the policy expired.

AO 72A
(Rev.8/82)

Therefore, St. Paul Fire had no duty to defend the underlying suits under the Umbrella policy as well.

### 3. Personal Injury Liability

The Umbrella Policy provides coverage for suits "resulting from a personal injury" that is caused by one of the "personal injury offenses" set forth in the policy. These offenses include:

> "false arrest, detention, or imprisonment; malicious prosecutions; wrongful entry or wrongful eviction; libel or slander; written or spoken material made public which belittles the products or work of others; written or spoken material made public which violates an individual's right to privacy; any other act that interferes with rights provided by an applicable Patients' Bill of Rights law or similar law."

None of Murtagh's lawsuits state a claim that arises from a covered personal injury offense. Moreover, Murtagh's contractual interference suit and RICO/Whistleblower suit are based on alleged wrongful conduct that would have occurred after the policy expired.

As to Murtagh's defamation claim against Dr. Aguayo, St. Paul Fire properly denied coverage because Aguayo is not a covered insured. Aguayo was not an employee of Emory when the alleged defamatory statements were made, and even if he were an employee, the exclusion precluding coverage of claims by co-workers would apply. Therefore, St. Paul Fire had no duty to defend the underlying lawsuit under the personal injury portion of the Umbrella policy.

Page 41

Accordingly, plaintiffs' motion for summary judgment on defendants' duty to defend the underlying breach of contract action [docket no. 41] is DENIED. Plaintiffs' motion for summary judgment on defendants' duty to defend the underlying interference with contractual relationships action [docket no. 42] is DENIED. Plaintiffs' motion for summary judgment on defendants' duty to defend the underlying administrative actions [docket no. 43] is DENIED. Plaintiffs' motion for summary judgment on defendants' duty to defend the underlying Whistleblower and RICO action [docket no. 44] is DENIED. Plaintiffs' motion for summary judgment on defendants' duty to defend the underlying qui tam action [docket no. 44] is DENIED.

Defendant St. Paul Mercury Insurance Company's motion for summary judgment [docket no. 33] is GRANTED. Defendant St. Paul Fire and Casualty Company's motion for summary judgment [docket no. 34] is GRANTED.


### Summary

(1) defendant St. Paul Fire and Casualty Company's motion for summary judgment [docket no. 34] is **GRANTED**;

(2) defendant St. Paul Mercury Insurance Company's motion for summary judgment [docket no. 33] is **GRANTED**;

AO 72A
(Rev.8/82)

(3)  plaintiffs'  motion  for  partial  summary  judgment  on defendants' duty to defend the underlying Qui Tam action [docket no. 45] is **DENIED;**

(4)  plaintiffs'  motion  for  partial  summary  judgment  on defendants' duty to defend the underlying RICO/Whistelblower action [docket no. 44] is **DENIED;**

(5)  plaintiffs'  motion  for  partial  summary  judgment  on defendants' duty to defend the underlying equal opportunity actions [docket no. 43] is **DENIED;**

(6)  plaintiffs'  motion  for  partial  summary  judgment  on defendants' duty to defend the underlying contractual interference action [docket no. 42] is **DENIED;**

(7)  plaintiffs'  motion  for  partial  summary  judgment  on defendants' duty to defend the underlying breach of contract action [docket no. 41] is **DENIED.**

SO ORDERED, this **10** day of December, 2003.

G. ERNEST TIDWELL, JUDGE
UNITED STATES DISTRICT COURT

Page 43

AO 72A
(Rev.8/82)